**PENNSYLVANIA TURNPIKE COMMISSION, Petitioner**

v.

**TEAMSTERS LOCAL 250, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 9, 2009.
Decided Jan. 28, 2010.

Gaetan J. Alfano, Philadelphia and Robert J. D'Anniballe, Jr., Steubenville, OH, for petitioner.

Ernest B. Orsatti, Pittsburgh, for respondent.

BEFORE: COHN JUBELIRER, Judge, and FRIEDMAN, Senior Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

The Pennsylvania Turnpike Commission (Commission), petitions for review from an Arbitration Award dated May 6, 2009 (Award), which sustained grievances filed by Teamsters, Local Union No. 250 (Local 250) on behalf of grievants Alex Lugin (Lugin) and Ken Fowler (Fowler) (Collectively, Grievants), and found that the Commission violated the Collective Bargaining Agreement (CBA) by utilizing supplemental employees outside the scope of the permissible reasons contained in Article 1, Section 3.E of the CBA, and determined that the "Commission must make the grievants in this instance whole for the situations of lost work opportunities." Award at 31. We affirm.

The Commission, Local 250, and Teamsters Local 77 (Local 77) are all parties to the CBA. The CBA covers toll collectors, maintenance employees, construction employees and supplemental employees. Local 77 represents employees employed in the eastern portion of the state, while Local 250 represents employees in the western portion of the state. Grievants, both toll collectors for the Commission, are members of Local 250.

A grievance was filed on behalf of Lugin on January 8, 2008, and on behalf of Fowler on January 10, 2008. The grievances were processed together, as both contested the Commission's use of supplemental employees in violation of Article 1, Section 3.E of the CBA.[1] On April 10, 2008, Local

1. Article 1, Section 3.E of the CBA reads in pertinent part as follows:

E. A "supplemental employee" is defined herein as a person who is hired as a replacement for a permanent full time employee who is on sick leave or other authorized leave. The use of supplemental employees is to be determined in accordance with the provisions of this Section. Any supplemental employee who was awarded a permanent full time position in the classification in which he is currently working shall receive one (1) day of credit toward satisfying his probationary period for each day of work completed during the immediately preceding six (6) month period. Supplemental employees will not be scheduled for more than eight (8) hours in any twenty-four (24) hour period, except as provided for in Article 9, Section 11, herein.

In addition to the uses listed above, supplemental employees may be used to:

(1) Fill in during the bidding process.

(2) Fill in for permanent employees who request a holiday off.

(3) Fill in for permanent employees who have been assigned to a different position as shift leaders or janitors.

(4) Create a Fare Collection District extra work opportunities totaling three (3) work opportunities times the number of interchanges in each District during each twenty-eight (28) day schedule. These work op-

250 filed two requests for grievance arbitration panels, one on behalf of Fowler, the other on behalf of Lugin. In September of 2008, the parties jointly agreed to select Michelle Miller–Kotula (Arbitrator) to serve as the arbitrator in this dispute. A hearing was held on December 10, 2008 and on February 17, 2009, during which the parties presented evidence. In arbitration, Local 250 requested the following remedy:

We are asking that the Arbitrator award back pay in the amount of time and one-half for all hours worked by supplemental employees when they worked beyond the parameters set forth in Article 1, Section E (sic), and that the Arbitrator order that the Employer cease and desist from ignoring Article 1, Section E (sic).

R.R. at 6a.

At the hearing, it was set forth that the Commission manages numerous turnpikes throughout Pennsylvania. It employs approximately 2,240 employees, 1,765 of whom are bargaining unit members, including 190 supplemental toll collectors. There are approximately 57 fare collection facilities throughout the state. The Commission is divided into six districts. Each district is composed of interchanges and within each interchange, there are various shifts.

Gary Pedicone (Pedicone) is the Secretary–Treasurer of Local 250 and Jock Rowe (Rowe) is the Secretary–Treasurer of Local 77. The jurisdictional split of Locals 250 and 77 (collectively, the Union) relates solely to daily operations. When negotiating with the Commission, both Locals represent the Union as a whole. Thus, anything that is negotiated and agreed to between the Commission and one of the Locals and ultimately placed in the CBA, applies to both Locals.

In 2007, the Commission and the Union began negotiations for a new multi-year CBA. Both Locals participated in the negotiations, which ultimately resulted in a new CBA, effective from October 1, 2007 to September 30, 2011. During negotiations, supplemental toll collectors were discussed. Local 77 took the lead with respect to negotiating changes to the scheduling of supplemental toll collectors.

From the Commission's standpoint, the changes were necessary to provide the Commission with more flexibility to deliver services in an efficient and cost effective manner. For the Union, the impetus for the change was to rectify a fundamental unfairness to the supplemental employees in the prior way of scheduling. Prior to the 2007 negotiations, a supplemental employee would designate a shift for which the supplemental employee was required to be available seven days a week until he or she obtained 40 hours. The shift was not limited to an interchange and that supplemental employee could be required to report to any interchange within the district for that shift. A supplemental employee could work only in the event there was a vacancy pursuant to Article 1, Section 3.E of the CBA. If the supplemental employee was not available during the designated shift, then he or she would face discipline.

During negotiations, the parties agreed to a procedure for scheduling supplemen-

portunities may be used in each District to assign supplemental employees to interchanges to address staffing needs including, but not limited to, those caused by traffic volume, special events and similar circumstances as determined by the Commission.

(5) Fill in for permanent employees during disciplinary action....

Reproduced Record (R.R.) at 51a.

tal employees, consistent with Article 1, Section 3.E. The scheduling provisions are set forth in Article 8, Section 8.B.2 which reads in pertinent part as follows:

2. Selection of work schedules and availability of supplemental employees.

a. Supplemental employees' lines shall be reselected in December of each year. Supplemental employees' schedules may need to be rescheduled every twenty-eight (28) days to accommodate the operational needs of the Commission.

b. Supplemental employees shall be permitted to designate by seniority during line selection the shifts for which they will be available for assignment. Once all lines are selected, the remaining supplemental employees shall select by seniority a location within the District within which he or she was hired. In the event that insufficient supplemental employees make themselves available by designation for a particular shift, the Commission shall assign shifts in inverse seniority order.

c. Once shifts are designated as above, a supplemental employee is expected to be available to work that shift as necessary. A supplemental employee who is unavailable for work on his designated shift more than once each month may be subject to disciplinary action.

d. Supplemental employees may be offered additional work opportunities other than their designated shifts, as needed.

R.R. at 60a–61a.

It is the position of the Commission that Article 8, Section 8 eliminates Article 1, Section 3.E, while Local 250 contends that Article 8, Section 8 merely sets forth the procedure for scheduling periods for which supplemental employees are available for work, within the parameters of Article 1, Section 3.E, which sets the limits for how supplemental employees may be utilized.

Both parties agree, however, that supplemental employees can now bid in seniority order to fill long term absences after the permanent employee bidding in December of each year. At that time, supplemental employees may also bid on shifts "for which they will be available for assignment." Article 8, Section 8.B.2.b. Unlike the permanent toll collectors who are locked into their time line bids for a year, supplemental employees are only guaranteed that they will be selected for available work on the selected line for twenty-eight days, "as necessary." Supplemental employees who are not able to select a line then select by seniority a location within the District. Article 8, Section 8.B.2.b. Previously, supplemental employees could only designate a shift and were required to be on call twenty-four hours, seven days a week for that shift. R.R. at 210a.

In October of 2007, the new CBA was ratified by the Union, and has been in effect since then. The CBA, however, was not formally executed by the Commission and the Union until September 17, 2008.

Following the ratification of the new CBA and pursuant to a new provision contained in the CBA, the Commission began to allow supplemental employees to remain at one interchange rather than moving the supplemental employees from interchange to interchange. Pedicone requested that the Commission revert to the prior way of scheduling supplemental employees. In response, in November and December of 2007, the Commission and Local 250 reached an agreement regarding the implementation of the new contract language contained in Article 8, Section 8 of the CBA. On December 7, 2007, the Commission memorialized the agreement in a

memorandum titled, Supplemental Toll Collector Scheduling Procedures (Memo). Although neither party executed this Memo, Pedicone stated that it was "a gentleman's agreement, a bridge until the CBA was executed." R.R. at 15a.

Pursuant to the Memo, "[d]uring December supplemental toll collectors by seniority will select from the available open established work lines within their district or a work location to be assigned to for overtime and scheduling purposes." R.R. at 202a. The supplemental toll collectors would be assigned to that particular interchange.

Shortly after the CBA between Local 250 and the Commission was memorialized in the Memo, Grievants filed grievances on January 9, 2008 and January 10, 2008, complaining of the scheduling changes with respect to supplemental employees.

The Commission contends that it abided by the Memo. Local 250 provided testimony which set forth that since the effective date of the CBA, the Commission has been scheduling supplemental employees for 40 hour weeks without regard to Article 1, Section 3.E of the CBA. The Commission did not rebut such testimony, but presented the testimony of Richard DiPiero (DiPiero), the Commission's Director of Fare Collection. DiPiero believed that the Memo had resolved the issue pertaining to the scheduling of supplemental employees; that they need not abide by Article 1, Section 3.E of the CBA, as Article 8, Section 8 of the CBA and the Memo did not require such.

Rowe testified that he believes that the Commission has implemented the changes in accordance with the negotiations, as reflected in the current CBA. According to Rowe, the Commission implemented the negotiated changes in the western region in the same manner that it implemented the negotiated changes in the eastern region. Rowe advanced a theory that Article 8, Section 8.B.2, required the Commission to make an estimate as to the number of hours that would be available for supplemental employees and then determine the number of "supplemental lines" to be bid on in December of each year. Rowe called this approach "balancing the scales". Rowe explained that the use of supplemental employees no longer needed to be justified on a "one-for-one" basis but rather on the basis of the Commission's annual estimates. R.R. at 216a–217a. Rowe further explained that the estimated number of leave hours is based on the Commission's research and review of the number of hours a permanent employee is on leave in any given year over the previous thirty years. R.R. at 217a.

Further, the balancing is confirmed by periodic accounting, as that can be done on an annual basis or as frequently as every twenty-eight days. If the Union identifies an imbalance between the number of supplemental employee shifts and a lack of Article 1, Section 3.E vacancies, then the supplemental employee schedules can be reset, as frequently as every 28 days. Thus, while the shifts that the supplemental employees work do not have to be specifically created by an Article 1, Section 3.E event, the shifts need to balance out when the accounting is conducted.

Following the hearing, both parties submitted post arbitration briefs. On May 6, 2009, the Arbitrator issued an opinion and Award which stated in pertinent part that:

As a result, the appropriate remedy is for the Commission to make the grievants whole who were affected by the use of supplemental employees outside the scope of the Agreement. The Commission must evaluate the schedules of the grievants to determine if the lost opportunities occurred as a result of the Commission while utilizing employees outside

of the permissible reasons contained in Article 1, Section 3.E, of the Agreement. Award at 30. On June 5, 2009, the Commission filed a petition for review before this court.

The Commission contends that the Arbitrator's Award was not rationally derived from the CBA. Specifically, the Commission contends: (1) that the Grievants did not request back pay on their grievance forms and did not present any evidence establishing that they had been adversely affected by the claimed violation; (2) that the Commission did not violate the CBA in the manner in which it utilized and scheduled supplemental employees and where the Arbitrator failed to reconcile Article 1, Section 3.E of the CBA with Article 8, Section 8 of the CBA; (3) that the Arbitrator erred in determining that changes to the CBA applied to Local 77, but not to Local 250 or Grievants; (4) that the Arbitrator modified a provision of the CBA by failing to recognize the admission of Local 250's principal officer that Local 250 and the Commission had entered into a Memo regarding the implementation of new contract language; and (5) that the Arbitrator modified a provision of the CBA by failing to recognize the agreed addition by the Commission and jointly-certified Locals 250 and 77 in Article 8 that permits the scheduling of some supplemental collectors to schedule lines every 28 days.

■ This court's review of a labor arbitration award is extremely narrow. "[A]n arbitrator must be given latitude and flexibility in fashioning a proper remedy and should not be limited in his or her problem solving to the exact language in the Agreement." [2] *Pennsylvania Turnpike Commission v. Teamsters Local Union No. 250,* 162 Pa.Cmwlth. 633, 639 A.2d 968, 974 (1994).

■ It is well established that in reviewing an arbitration award under the Public Employee Relations Act (PERA), the court must apply the "essence test", a standard which requires great deference to an arbitrator's interpretation of the CBA. *Northwest Area School District v. Northwest Area Education Association,* 954 A.2d 111, 114 (Pa.Cmwlth.2008). This analysis requires a determination of whether the issue, as properly defined, falls within the terms of the CBA, and if so, whether the arbitrator's interpretation of the CBA is rationally derived therefrom. *Id.* The arbitrator's award must be respected by the judiciary if the interpretation can in any rational way be derived from the CBA, viewed in light of its language, its context and any other indicia of the parties' intention. *Id.* A court will only vacate an arbitration award where the award indisputably and genuinely is without foundation, or fails to logically flow from the CBA.

2. The above quotation cites the following in support of its position:
*Pennsylvania State Education Ass'n with Pennsylvania School Serv. Personnel/PSEA v. Appalachia Intermediate Unit 08,* 505 Pa. 1, 476 A.2d 360 (1984)(arbitrator was within his authority to find a violation of the collective bargaining agreement and award damages and interest to employees); [*Midland Borough School District v.*] *Midland Education Ass'n* [*PSEA,* 532 Pa. 530, 616 A.2d 633 (1992)]; *Danville Education Ass'n v. Danville Area School Dist.,* 78 Pa.Commonwealth Ct. [Pa.Cmwlth.] 238, 467 A.2d 644 (1983) (arbitrator did not exceed authority in awarding monetary damages and ordering return to previous work schedule); [*Commonwealth v.*] *Council 13, AFSCME*[, 43 Pa.Cmwlth. 177, 401 A.2d 1248 (Pa. Cmwlth.1979)] (although collective bargaining agreement was silent on remedy where compensation is delayed, arbitrator was within his authority by awarding interest paid on the delayed compensation).

■ "[A] court should not engage in merits review of the matter. Indeed, after our reaffirmation of the circumscribed essence test we made it eminently clear that "the essence test does not permit an appellate court to intrude into the domain of the arbitrator and determine whether an award is 'manifestly unreasonable'."" (Citation omitted); *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 595 Pa. 648, 661, 939 A.2d 855, 863 (2007). This court may not substitute its own judgment for that of the arbitrator even if our interpretation of the CBA differs from that of the arbitrator.

■ First, the Commission contends that the Arbitrator's Award was not rationally derived from the CBA and failed to draw its essence from the CBA because the Grievants did not request back pay on their grievance forms and did not present any evidence establishing that they had been adversely affected by the claimed violation.

The Commission, however, confuses "grievance" with legal pleadings. The CBA in Article 21, Section 1, defines "grievance" as "a dispute concerning the interpretation, application or alleged violation of a specific term or provision of this Agreement." R.R. at 87a. There is nothing in the CBA requiring the Union to specify in writing the specific remedy it is requesting in a grievance.

The grievance procedure provides for a three-step process, allowing the parties to fully discuss their respective positions regarding grievances. Pedicone made it clear to the Commission that he was seeking a make whole remedy, so it was fully within the Arbitrator's authority to award just that.[3] Counsel for the Union addressed that point at the arbitration hearing in response to an objection to the admission of documents which showed how the use of supplemental employees throughout the western half of the state, in violation of the CBA, affected the members of Local 250.[4] The Arbitrator overruled the objection and admitted the documents which show that Grievants, along with all members of Local 250, were adversely affected by the Commission's violations. The Commission was not surprised by the Union's case. It knew throughout the processing of the grievances through

3. During the processing of this grievance, the Union's principal officer made it clear that if the case proceeded to arbitration, he was seeking a make whole remedy for all employees affected by this contract violation. R.R. at 10a, 14a, 15a. This testimony was not contradicted. In fact, DiPiero, the Commission official who testified at the arbitration hearing, admitted that he learned from the Commission's in-house counsel, within a month prior to the arbitration hearing, that the Union was seeking a make whole remedy.

4. The Union further argued when the Commission objected to the documentary evidence that:
[t]he remedy is that they abide by the contract. Well, abiding by the contract means paying regular full time employees for overtime compensation that they would have

had had the contract not been violated.... The testimony was that Mr. Pedicone had mentioned this every time he talked to the Turnpike about these grievances, that what he was seeking was overtime compensation to regular employees who were not given the opportunity to perform the work that we're talking about.... The evidence [documents] is certainly relevant if there are changes to the schedule that have been made than that can be worked our during the remedy phase of the case when the parties sit down and try to figure out how much it is actually owed.
R.R. at 21a. Such documentary evidence was admitted for the purpose of showing how the bargaining unit was affected by the Commission using the supplemental employees in violation of the CBA.

the grievance procedure that the Union was seeking a make whole remedy. No evidence to the contrary was presented.

■ The Arbitrator's Award of backpay to all affected Union members was within the Arbitrator's discretion. The Arbitrator did exactly what she was commissioned to do. She found that the Commission utilized supplemental employees for reasons not permitted by Article 1, Section 3.E, and she issued an appropriate remedy. "It is the arbitrator's construction which was bargained for and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *State System of Higher Education (Cheyney University) v. State College & University Professional Association (PSEA–NEA)*, 560 Pa. 135, 143–144, 743 A.2d 405, 410 (1999).

■ Second, the Commission contends that the Arbitrators Award was not rationally derived from the CBA because the Commission did not violate the CBA in the manner in which it utilized and scheduled supplemental employees where the Arbitrator failed to reconcile Article 1, Section 3.E of the CBA with Article 8, Section 8 of the CBA.

Article 1, Section 3.E of the CBA sets forth the restricted uses of supplemental employees. Both parties agree that the only change made to Section 3.E was to allow for supplemental employees to "fill in for permanent employees during disciplinary action." R.R. at 51a. The newly negotiated Article 8, Section 8.B.2 of the CBA, provides procedures for scheduling supplemental employees but did not provide for any increase in allowable usage of supplemental employees. These two provisions are not contradictory and can be reconciled, as was done by the Arbitrator. Article 1, Section 3.E, sets the limits for how supplemental employees may be utilized, and Article 8, Section 8.B.2, sets forth a procedure for scheduling periods for which supplemental employees are available to work, but within the parameters of Article 1, Section 3.E.[5] Although the Commission disagrees with her reasoning, the Arbitrator correctly reconciled these two provisions in a manner which was derived from the CBA in a rational way and, thus, passes the essence test.

Third, the Commission contends that the Arbitrator's Award was not rationally derived from the CBA because the Arbitrator erred in determining that changes to the CBA applied to Local 77, but not to Local 250 or Grievants.

The Arbitrator did not determine that changes to the CBA applied to Local 77, but not to Local 250 or Grievants. The Commission believes that as Rowe testified that Local 77 uses a "balancing of the scales" approach and Local 250 does not, that the Arbitrator found two different

5. Supplemental employees can now bid in seniority order to fill long term absences after the permanent employees bidding in December of each year. At that time, supplemental employees may also bid on shifts for which they will be available for assignment. Unlike the permanent toll collectors, who are locked in for their line bids for a year, supplemental employees are only guaranteed that they will be selected for available work on the selected line for twenty-eight days "as necessary". Supplemental employees who are not able to select a line then select by seniority a location within the District. Previously, supplemental employees could only designate a shift and were required to be on call 24 hours, 7 days a week for that shift. Under the new agreement, supplemental employees could enjoy more stability in their private lives. However, no language in the current CBA expands the permitted use of supplemental employees, except to permit their use to fill in for permanent employees during disciplinary action.

methods for each Local. This is not the case. The Arbitrator's opinion reads in pertinent part as follows:

> In my considered opinion, there is no consistent understanding of how the supplemental employee language has been applied since the Union Presidents from the two Unions do not share the same understanding of how supplemental employees are used by the Commission. The balancing theory explained by the Commission does not establish this practice has been consistently used by the parties. The Commission must follow the clear language contained in the Agreement on how supplemental employees are to be scheduled because no convincing practice is in place to establish the balancing of scales approach should be used. The Commission violated the Agreement in my opinion when the plain language of the Agreement was not followed in the manner in which supplemental employees are to be used.

Arbitrator's Award at 29; R.R. at 322a.

The Arbitrator specifically confined herself to interpreting the CBA and did not deviate from her obligation to do so. The Arbitrator rejected Rowe's "balancing the scales" interpretation of the contract, as this method directly violates Article 1, Section 3.E of the CBA.[6] The Arbitrator's decision was based upon clear and unambiguous contract language. Nothing in Article 1, Section 3.E allows for the use of supplemental employees under the balancing theory of Rowe. The Arbitrator did not allow for a different interpretation of the CBA for Local 77 and determined that such interpretation was not supported.

■ Fourth, the Commission contends that the Arbitrator's Award was not ra-

tionally derived from the CBA because the Arbitrator modified a provision of the CBA by failing to recognize the admission of Local 250's principal officer that Local 250 and the Commission had entered into a Memo regarding the implementation of new contract language.

The delay in executing the CBA was due to the issues regarding the supplemental employees. The parties entered into the Memo in order to sign the CBA and to have the supplemental employee issue resolved through arbitration without prejudice to their respective positions. The Memo allowed the Commission to proceed with scheduling supplemental employees during the pendency of the grievance process.

A review of the Memo reveals that it does not contain any provisions regarding a "balancing of scales" approach, nor does it contain any other language that can be construed as permitting the Commission to use supplemental employees for purposes other than those delineated in Article 1, Section 3.E of the CBA. The Arbitrator gave the Memo and the testimony of Local 250 union officer their proper consideration and did not thereby modify any provision of the CBA.

■ Fifth, the Commission contends that the Arbitrator's Award was not rationally derived from the CBA because the Arbitrator modified a provision of the CBA by failing to recognize the agreed addition by the Commission and jointly-certified Locals 250 and 77 in Article 8 that permits the scheduling of some supplemental collectors to schedule lines every 28 days.

---

**6.** The "balancing theory" would permit the Commission to use supplemental employees even when not permitted by Article 1, Section 3.E, so long as the total number of hours worked by supplemental employees does not exceed the Commission's annual estimate. This method directly violates Article 1, Section 3.E.

■ The Arbitrator did recognize the Article 8 addition to the CBA, which sets forth a procedure for scheduling periods for which supplemental employees are available to work, and reconciled it with Article 1, Section 3.E, which sets the limits for how supplemental employees may be utilized. The Arbitrator correctly refused to modify the CBA to expand its use of supplemental employees beyond the express limitations set forth in Article 1, Section 3.E, of the CBA. The Arbitrator did not have the authority to go beyond the CBA and neither does this court. "It is the Arbitrator's role to interpret the terms of the CBA." *Pennsylvania Turnpike Commission v. Teamsters Local Union No. 250*, 948 A.2d 196, 207 (Pa.Cmwlth. 2008). The Arbitrator's Award draws its essence from the CBA.

The CBA provides that "[t]he Arbitrator shall have no power or authority to add to, subtract from or modify the provisions of this agreement in arriving at a decision on the issue(s) and shall confine [her] decision solely to the application and interpretation of this agreement." CBA, Article 26, Section A.1. The Arbitrator did not exceed her scope of authority under the CBA.

Accordingly, we affirm the Arbitrator's Award.

## ORDER

AND NOW, this 28th day of January, 2010, the award of arbitrator Michelle Miller–Kotula, in the above-captioned matter, is affirmed.