**SHAMOKIN AREA SCHOOL DISTRICT**

v.

**AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 86, Appellant.**

Commonwealth Court of Pennsylvania.

Argued March 9, 2011.

Decided April 18, 2011.

**580**

Amy L. Rosenberger, Philadelphia, for appellant.

Benjamin Pratt, York, for appellee.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and PELLEGRINI, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge BUTLER.

The American Federation of State, County, and Municipal Employees District Council 86 (Union) appeals from the December 30, 2009 order of the Court of Common Pleas of Northumberland County (trial court) granting the Petition to Vacate Arbitration Award filed by the Shamokin Area School District (District). The issue before the Court is whether enforcement of the Arbitrator's award would violate public policy. For reasons that follow, we reverse the order of the trial court.

Joseph Weaver (Weaver) was employed by the District as a groundskeeper. On February 26, 2008, Weaver was instructed by one of his supervisors to stop the task he was doing and to complete a previously assigned task. Weaver called the Superintendent to complain, and failed to hang up his cell phone prior to yelling and screaming about his supervisor to another co-worker.[1] On February 27, 2008, a pre-disciplinary hearing was held, and on March 3, 2008, after another pre-disciplinary hearing, Weaver was suspended indefinitely pending approval of the District's Board of Directors (Board). On March 11, 2008, the Board voted to dismiss Weaver pursuant to Section 514 of the Public School Code of 1949 (Public School Code),[2] which provides that the Board has the

---

1. Specifically, Weaver said "I wish I could punch him right in the ... mouth. I'm just gonna pay somebody. I can't do it so I'm just gonna pay somebody. I'll say here's a hundred dollars. Put a ... dusting on him." *Shamokin Area Sch. Dist. v. Am. Fed'n of State, Cnty. and Mun. Emps. Dist. Council 86* (No. CV–09–1958, filed April 28, 2010), slip op. at 1.

2. Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 5–514.

right to remove any employee for improper conduct.

Weaver filed a grievance which the Union referred to arbitration pursuant to the applicable collective bargaining agreement (CBA). A hearing was held on April 8, 2009. On August 4, 2009, the Arbitrator found Weaver culpable for disregarding instructions, but sustained the grievance as pertaining to Weaver's threatening statement, deeming his discharge to be without just cause. Thus, the Arbitrator's award converted Weaver's termination into a four week suspension, ordered Weaver to attend an anger management program, and placed Weaver on a probationary status for one year. On August 24, 2009, the . District filed a Petition for Review and Application to Vacate the Arbitrator's Award. The trial court held a hearing on October 14, 2009. On December 30, 2009, the trial court entered an order vacating the award of the Arbitrator, finding that Weaver's actions violated the public policy against violence in schools. The Union appealed to this Court.

The Union argues that the trial court improperly refused to accept the Arbitrator's factual findings, effectively engaged in plenary, de novo review, and improperly applied the narrow public policy exception established in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association (Westmoreland)*, 595 Pa. 648, 939 A.2d 855 (2007). We agree.

■ Generally, "[t]he standard of review to be applied ... is one of deference to the arbitrator's award.... [And] our scope of review of a grievance arbitration award is the essence test." *Slippery Rock Univ. of Pa. v. Ass'n of Pa. State Coll. & Univ. Faculties (Slippery Rock)*, 916 A.2d 736, 740 n. 3 (Pa.Cmwlth.2007) (citation omitted). Fundamentally, to meet the es-

sence test the award must draw its essence from the CBA. *Id.* The essence test was first established in *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA) (Beaver County)*, 473 Pa. 576, 375 A.2d 1267 (1977). In *Beaver County*, the Pennsylvania Supreme Court specifically held:

> where a task of an arbitrator ... has been to determine the intention of the contracting parties as evidenced by their [CBA] and the circumstances surrounding its execution, then *the arbitrator's award* is based on a resolution of a question of fact and *is to be respected by the judiciary if the interpretation can in any rational way be derived from the agreement,* viewed in light of its language, its context, and any other indicia of the parties' intention.

*Id.*, 473 Pa. at 593–94, 375 A.2d at 1275 (quotation marks omitted) (emphasis added).

Here, it is uncontested that the award in the instant case meets the essence test; however, the Pennsylvania Supreme Court has carved out many exceptions thereto. The first exception was the manifestly unreasonable test, whereby an arbitrator's award could be vacated if the court held the arbitrator's award to be manifestly unreasonable. *Phila. Hous. Auth. v. Union of Sec. Officers # 1*, 500 Pa. 213, 455 A.2d 625 (1983); *Pennsylvania Liquor Control Bd. v. Indep. State Stores Union*, 520 Pa. 266, 553 A.2d 948 (1989). Because this standard practically eliminated the deference afforded to the arbitrator, it was abolished in *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999), wherein the Court held that the arbitrator's award would stand if: (1) "the issue as properly defined is within the

terms of the collective bargaining agreement"; and (2) "the arbitrator's interpretation can rationally be derived from the [CBA]." *Id.*, 560 Pa. at 150, 743 A.2d at 413.

This exception was expanded when the Pennsylvania Supreme Court adopted the core function exception to the essence test in *City of Easton v. American Federation of State, County and Municipal Employees, AFL–CIO, Local 447*, 562 Pa. 438, 756 A.2d 1107 (2000), wherein the Court recognized that governmental agencies do not have the freedom to relinquish those powers that are essential to the proper discharge of their functions.[3] Thus, if a government agency cannot bargain away its right to terminate an employee, the fact that grounds for that termination are not in the CBA does not give the Arbitrator the right to reinstate said employee. The core functions exception, however, was replaced with the aforementioned public policy exception established in *Westmoreland.*

■■■■ The public policy exception espoused in *Westmoreland* represents the current state of the law. It is a narrow exception prohibiting a court from enforcing an arbitrator's award that contravenes public policy. As explained by our Supreme Court, "a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland*, 595 Pa. at 666, 939 A.2d at 865–66. Thus, in this case, we must look to the award and determine whether its reinstatement of Weaver violates an established public policy.

We recognize that there is a distinct public policy of protecting students from violence on school property, which is derived from the Pennsylvania school code. Specifically: Sections 1301–A to 1313–A of the Public School Code,[4] entitled Safe Schools, requires reporting of actions such as threatening or intimidating a school official or a student, disorderly conduct, and harassment by communication; Section 111 of the Public School Code[5] requires background checks of all prospective employees; and Section 1303.1–A of the Public School Code[6] prohibits bullying.[7] Thus, the public policy protecting students from violence is a well defined and established policy.[8] We also recognize that the District has a zero tolerance policy for violence in schools, and that the District has a direct responsibility for the safety of its pupils pursuant to Section 1317 of the Public School Code[9] which provides that all teachers have the same responsibility for their students as do their parents. Further, we note that Weaver was, in fact,

---

**3.** *City of Easton* was abrogated by *Westmoreland.*

**4.** 24 P.S. §§ 13–1301–A—13–1313–A, *as amended*, added by Sections 6 and 7 of the Act of June 30, 1995, P.L. 220 and Section 3 of the Act of November 22, 2000, P.L. 672.

**5.** Added by Section 1 of the Act of July 1, 1985, P.L. 129, 24 P.S. § 1–111.

**6.** Added by Section 6 of the Act of July 9, 2008, P.L. 846, 24 P.S. § 13–1301.1A.

**7.** The trial court also relied on Section 2706 of the Crimes Code, 18 Pa.C.S. § 2706, which proscribes the use of profane language and terroristic threats, as part of the foundation of the public policy against violence on school property. Section 2706, however, is not specific to violence on school property.

**8.** *See Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educational Support Personnel Association (Westmoreland II)*, 977 A.2d 1205 (Pa.Cmwlth.2009).

**9.** 24 P.S. § 13–1317.

on school property when he indirectly threatened the safety of his supervisor.

Contrary to the trial court's determination that Weaver's actions violated the public policy against violence in schools, however, we conclude that Weaver's conduct did not trigger the public policy against violence in schools because it did not implicate the public concern of protection *of students* from violence. Moreover, Weaver's statements did not rise to the level of terroristic threats. Although his statements were highly inappropriate, they constituted nothing more than a rant about a supervisor, which was not directed immediately toward that supervisor. Weaver's conduct did not rise to the level of violating the public policy of protecting students from violence on school property, in part because the statements were made in an isolated garage away from the students. Thus, as inappropriate as Weaver's outburst was, it simply did not implicate the public concern for student safety.

 Notwithstanding, the appropriate test is not whether Weaver's actions violated public policy, but whether the Arbitrator's award violates public policy. Here, the Arbitrator made a finding that Weaver's discharge for making a threatening statement was without just cause because "the District denied him his proper due process." Union's Br., Ex. C at 12. Further, the Arbitrator found that Weaver's "treatment was palpably disparate, and for that reason, without just cause." Union's Br., Ex. C at 13. Although the Arbitrator found Weaver culpable for disregarding instructions, he sustained the grievance and reinstated Weaver based upon the above-stated findings. The arbitration award was not based on findings regarding the implication of student safety. In fact, the Arbitrator made absolutely no findings regarding whether Weaver's conduct implicated student safety. Again, the award

was based on the denial of due process and disparate treatment, not student safety.

We, therefore, hold that within the context of this case, reinstating a groundskeeper, who vented about a supervisor by screaming in a garage which was isolated from students, conditioned upon a one-year probation and a required anger management program, does not violate the public policy of protecting students from violence on school property. While we recognize that reinstating a school district employee who had actually struck a student, bullied a student, or threatened violence upon a student on school grounds, could very well trigger the established public policy of protecting students from violence on school property, this is not such a case.

As stated above, the test is not whether Weaver's conduct violated an established public policy but whether the Arbitrator's award of reinstating Weaver contravenes an established public policy. Here, the Arbitrator's award of reinstating Weaver is not at variance with the established public policy of protecting students from violence on school property. Thus, we hold that the trial court improperly applied the narrow public policy exception established in *Westmoreland.*

For all of the above reasons, the order of the trial court is reversed.

### ORDER

AND NOW, this 18th day of April, 2011, the December 30, 2009 order of the Court of Common Pleas of Northumberland County is reversed.

DISSENTING OPINION BY Judge BROBSON.

I respectfully dissent. Because I believe that the arbitrator's decision violates public policy, I would affirm the trial

court's decision and vacate the arbitration award in this case.

This appeal stems from a decision by the Board of Directors (Board) of the Shamokin Area School District (District) to remove Joseph Weaver (Weaver) from his position with the District as a groundskeeper pursuant to the Board's authority under Section 514 of the Public School Code of 1949 (Code), P.L. 30, 24 P.S. § 5–514.[1] Pursuant to the terms of a collective bargaining agreement, Weaver filed a grievance.

Looking *only* at the arbitrator's written decision in this case,[2] it is evident that the arbitrator found that Weaver engaged in the conduct that prompted the Board to terminate his employment. In the course of a profanity-laced rant, Weaver threatened physical harm on another District employee. The arbitrator felt such conduct was worthy of disciplinary action, but not termination. The arbitrator sustained the grievance and fashioned the following remedy:

> As a remedy, the Grievant must be reinstated and made whole with back pay, seniority and all benefits *on condition that he complete anger management and stress classes and serve a one-year probation, during which one or more threatening outbursts may result in*

*more serious discipline, including termination of his employment.*

(Award at 14 (emphasis added).) The arbitrator thus substituted her judgment for that of the elected Board and concluded that, rather than termination, disciplinary measures including a four-week suspension, *anger and stress management classes*, and probation were more appropriate under the circumstances. I am particularly troubled by the arbitrator's decision to reinstate Weaver *before* he completes the anger and stress management classes.

In light of the arbitrator's findings, I believe that the arbitrator's award "contravenes public policy," which is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/ NEA*, 595 Pa. 648, 666, 939 A.2d 855, 866 (2007) (*Westmoreland I* ). I agree with the District that there is a strong public policy in favor of safe schools. The public policy is well-defined in legal precedent and in statute. "A school system has an unmistakable duty to create and maintain a safe environment for its students as a

1. Section 514 of the Code provides, in relevant part:

> The board of school directors in any school district, except as herein otherwise provided, shall after due notice, giving the reasons therefor, and after hearing if demanded, have the right at any time to remove any of its officers, employes, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct.

2. The majority claims that the arbitrator's decision to reinstate Weaver immediately, while he receives anger management counseling,

"was not based on findings regarding the implication of student safety." (Majority Op. at 583.) Thus, the majority appears to contend that the trial court's decision in this case is at odds with the arbitrator's factfinding. As explained above, such a contention cannot withstand scrutiny. The arbitrator clearly found that Weaver has enough difficulty coping with anger arising out of his work environment that the arbitrator required Weaver to receive counseling. It is this finding, and the arbitrator's decision to reinstate immediately Weaver to his job at the school notwithstanding this finding, that warrant consideration of whether the arbitrator's award violates public policy.

matter of common law." *See Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA,* 977 A.2d 1205, 1209 (Pa. Cmwlth.2009). "The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order." *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

In 1995, the General Assembly passed an amendment to the Code commonly referred to as the Safe Schools Act (Act).[3] The Act created a state-level Office for Safe Schools within the Department of Education. 24 P.S. § 13–1302–A. The Act requires all school entities to report all acts of violence "by any person on school property." *Id.* § 13–1303–A(b).[4] School entities are required to maintain records of all incidents of violence on school grounds. *Id.* § 13–1307–A. The Act evidences the General Assembly's intent to curb *all* violence on school property, not just violence by or directed toward students and teachers.[5]

In this case, the arbitrator did not conclude that Weaver posed *no* threat to his co-workers or workplace or that his rant was an isolated incident not likely to be repeated or acted upon. To the contrary, her decision to compel Weaver to attend anger management classes and to place him on probation is an indication that the arbitrator did not feel that Weaver's conduct was a trivial matter of an employee merely blowing off steam about a supervisor. She nonetheless is directing the District and the Board to reinstate immediately an employee who even she found has unresolved anger and stress management issues. In light of the strong public policy in favor of safe schools and the attendant duties imposed on school districts, the arbitrator's decision should not stand. I do not believe a school district can bargain away its judgment on whether those in its employ who threaten acts of violence on school grounds should be allowed to return to work. Whether a particular employee's continued employment poses a threat to a safe school environment is a matter of discretion that should be left to the elected school board.

Because the arbitrator in this case concluded that Weaver engaged in the conduct in question and had unresolved stress and anger management issues, the arbitrator's decision to override the Board's judgment and order the District to reinstate Weaver was contrary to public policy. On this basis, I would affirm the trial court.[6]

Judges LEAVITT and McCULLOUGH join in this dissenting opinion.

---

3. Sections 13–1301–A to –1313–A of the Code, *added by* Act of June 30, 1995, P.L. 220, *as amended,* 24 P.S. §§ 13–1301–A to –1313–A.

4. The term "school property" is defined broadly under the Act to include, *inter alia,* "any public school grounds." According to the arbitrator's findings, Weaver was on school grounds—a garage located at the stadium—at the time of the rant.

5. I disagree with the majority that the public policy in favor of student safety is superior to or distinguishable from the strong and well-defined public policy in favor of maintaining a safe school environment for students and families, educators, administrators and school employees.

6. As the majority points out, the arbitrator made several findings and conclusions critical of the District's investigation of the incident and, in particular, the District's questioning

of Weaver. (Award at 12.) The arbitrator characterized this conduct as denying Weaver "his proper due process" and concluded, as a result, that the District dismissed Weaver "without just cause." (*Id.*) The arbitrator also compared the discipline meted out to Weaver to that of another District employee and concluded that Weaver's "treatment was palpably disparate, and for that reason, without just cause." (*Id.* at 13.) My concern, however, is not with these findings and conclusions, but with the remedy fashioned by the arbitrator in light of all of her findings and conclusions. This case would be different if, for example, (a) the arbitrator had required Weaver to complete successfully anger management classes *before* being reinstated to his employment with the District; (b) if the arbitrator had *not* found that Weaver has anger management and stress issues that required counseling, or (c) if the arbitrator had found affirmatively that Weaver posed no present threat to school safety and security.