IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pennsylvania Western University of Pennsylvania, State System of Higher Education, | : : : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1424 C.D. 2024 |
| | : | |
| Association of Pennsylvania State College and University Faculty, | : : | Argued: December 8, 2025 |
| Respondent | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE STACY WALLACE, Judge
                   HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE McCULLOUGH                                      FILED: January 9, 2026

Pennsylvania Western University of Pennsylvania (University), State System of Higher Education (State System) petitions for review of the September 24, 2024 Arbitrator's Award and Opinion (Arbitration Award or Award) that sustained a grievance filed by the Association of Pennsylvania State College and University Faculty (APSCUF)[1] on behalf of University professor Uraina Pack (Dr. Pack). The grievance (Grievance) challenged the University's denial of Dr. Pack's request that the University accommodate her disability by permitting her to teach and otherwise fulfill her faculty duties utilizing exclusively online or distance education technology.

In this Court, the University argues that the Arbitration Award fails to draw its essence from the parties' Collective Bargaining Agreement (CBA) and violates well-established and defined public policy.

After careful review, we affirm.

---

[1] Although APSCUF's name in the caption uses the singular "Faculty," the correct term is "Faculties." *See* https://www.apscuf.org/ (last visited January 9, 2026). Neither party has requested to amend the caption to make the correction, so we leave it as originally filed.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Relevant Facts

The material facts of this case largely are undisputed and may be summarized as follows. Dr. Pack is a professor of English at the University, where she has taught on the Clarion campus[2] for over 20 years. She has advanced degrees in English and instructional design and technology and was one of the first English faculty members to convert courses to an online format. Dr. Pack has taught online courses, termed "distance education" in the CBA, for approximately 12 years, typically 1 or 2 such courses each semester. Article 41 of the CBA governs distance education and provides, in pertinent part, as follows:

A. Preamble

1. The purpose of distance education is to increase access to and the availability of quality curriculum offerings and educational experiences at [the University].

2. The parties agree that meeting students' needs and expanding access, not cost efficiencies, are the primary drivers of distance education, **and the availability of distance education options will not diminish the recognized value of classroom instruction. The parties further agree that faculty disciplinary expertise is crucial to evaluating the appropriate use and effectiveness of distance education.**

. . . .

4. Distance education is part of the approved curriculum . . . .

. . . .

---

[2] During the Summer of 2022, Clarion University of Pennsylvania merged with Edinboro and California Universities of Pennsylvania to form the University. Dr. Pack has taught continuously at either Clarion University of Pennsylvania or what is now the University's Clarion campus.

> C.    FACULTY Participation and Training
>
> 1.    Except where specifically stated in a letter of appointment for a FACULTY MEMBER describing their job expectations, **teaching through distance education technologies shall be voluntary.**

(Reproduced Record (R.R.) at 419a, 421a) (emphasis provided) (capitalizations in original).

Dr. Pack suffered a brain aneurysm in 2019, which required multiple surgeries. She recovered from the aneurysm sufficiently to return to teaching in the Spring 2021 semester. In advance of doing so, Dr. Pack submitted medical documentation to the University explaining that she suffers from ongoing and permanent physical limitations, including short-term memory loss, speech impairment, and chronic pain and headaches. She accordingly requested an accommodation from the University permitting her to teach exclusively online. In response, the University approved a fully online teaching schedule for the Spring 2021 semester and for the entire 2021-2022 academic year. During this period, Dr. Pack was able, via online communication, to teach her courses, conduct research, participate in meetings, and interact with students about their work.

Dr. Pack recertified her disability with the University during the summer of 2022 and renewed her accommodation request to teach fully online. She again submitted medical documentation of her various permanent limitations and provided correspondence from her physician recommending a fully online teaching schedule. The University again approved a fully online teaching schedule for the entirety of the 2022-2023 school year. As part of the accommodation, Dr. Pack was permitted to hold office hours, participate in department meetings, and attend trainings remotely, and her grading periods were extended out five to seven days.

3

In the spring of 2023, the University required Dr. Pack to recertify her medical conditions and renew her accommodation request to teach fully online for the 2023-2024 academic year. She did so. After discussions among individuals from University administration and Dr. Pack's academic department, Amy Salsgiver, the University's Executive Director of Equity and Title IX, denied Dr. Pack's accommodation request, concluding that a fully online teaching schedule was not reasonable given the University's need for on-campus courses. Salsgiver determined that teaching in person those courses designed for in-person instruction was an essential function of Dr. Pack's position. Dr. Pack accordingly was assigned to teach two in-person courses and two online courses during the Fall 2023 semester. (R.R. at 502a.)

Dr. Pack appealed the decision to the Office of Human Resources, alleging that the University had failed to accommodate her disability in accordance with Article 3 (Fair Practices), Section A of the CBA, which provides as follows:

> Neither party hereto nor any FACULTY MEMBER shall discriminate against any other FACULTY MEMBER or candidate for employment on the basis of race, creed, color, sex, gender, gender identity or expression, genetic information, disability, sexual orientation, veteran status, family status, age, national origin, APSCUF membership or activity or lack thereof, political belief and/or affiliation, or on account of any other basis prohibited by law, including harassment based upon any such status noted above. **Where existing laws against discrimination require accommodation, the [University] will accommodate to the extent required by law.**

(R.R. at 299a) (emphasis provided). The University's Senior Vice President for Human Resources, Eric Guiser, denied the appeal without further investigation, concluding that performing in-person instruction was an essential part of Dr. Pack's job. In his April 19, 2024 denial letter, Guiser explained:

4

Teaching face[-]to[-]face courses that are designed to be face to face is considered an[ ] essential function of your position. The University has a need for on[-]campus courses[,] and teaching a fully remote schedule is not a reasonable accommodation. The accommodation provided[ ], . . . two courses online and two courses face[-]to[-]face[,] is a reasonable accommodation. Your appeal to work fully remotely is denied.

(R.R. at 503a.)

Dr. Pack filed a grievance (Grievance), which was submitted to arbitration.

## B.    <u>Arbitration and Arbitration Award</u>[3]

The issue before the Arbitrator, as collectively presented by the parties, was whether the University violated the terms of the CBA by failing to accommodate Dr. Pack's request for a reasonable accommodation under the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213. *See* Section 12132 of the ADA, 42 U.S.C. § 12132 (providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity").[4] APSCUF argued that Dr. Pack's disabilities are permanent and that her request for a fully online teaching schedule was a reasonable accommodation that already had been permitted by the University for two years and

---

[3] The Grievance initially was assigned to Arbitrator Mattye Gandel, who conducted a hearing on May 13, 2024. In July 2024, the University filed a Petition for Recusal, and Arbitrator Gandel agreed to recuse herself from the case. The parties thereafter mutually agreed to reassign the case to Arbitrator Jay Nadelbach, Esq. (Arbitrator), who, after reviewing the hearing transcript, exhibits, and briefing, issued the Arbitration Award.

[4] The parties initially disputed whether the issue before the Arbitrator included whether the University had violated the ADA. *See* R.R. at 24a-39a. However, the parties ultimately appear to have agreed that the issue was limited to whether the University had violated the terms of the CBA, which incorporates the reasonable accommodation requirements of the ADA. *Id.* That is the issue addressed in the Arbitration Award, and the parties have not challenged its scope in this appeal.

that did not cause an undue hardship. APSCUF requested that the Arbitrator direct the University to return Dr. Pack to a fully online teaching schedule. (Arbitration Award at 6-7.)

The University did not dispute Dr. Pack's background, qualifications, or disability. Rather, the University argued that, under the ADA, Dr. Pack had to establish that she was capable of performing the essential functions of her position with or without a reasonable accommodation. The University contended that in-person instruction was an essential part of Dr. Pack's position and that exempting her from it would impose an undue hardship on the University by hindering its ability to schedule classes and provide in-person instruction. The University further argued generally that online instruction negatively impacts student enrollment and retention. *Id.* at 7-8.

In support of its case, the University first presented Salsgiver's testimony. She explained that when the former Edinboro, California, and Clarion Universities of Pennsylvania consolidated in 2022, Dr. Pack already had been granted a fully online teaching schedule for the 2022-2023 academic year. For the 2023-2024 academic year, however, the University reevaluated Dr. Pack's accommodation request. Salsgiver had meetings with the University Dean and Dr. Leah Chambers, the Chair of the English, Philosophy, and Modern Languages Department. After those meetings, in which Dr. Pack was not invited to participate, a fully online schedule was determined to be not feasible. This was so because Dr. Pack's academic department and course listings were changing, and the University had to accommodate upcoming faculty sabbaticals and retirements. The University deemed in-person instruction to be essential and set Dr. Pack's schedule to include two in-person courses and two online courses. Salsgiver testified that the hybrid schedule was not in reality a disability accommodation but rather was designed to meet the department's needs. *Id.* at 8-9.

6

The University next presented the testimony of Dr. Chambers, who testified that granting Dr. Pack's accommodation request would place an unfair burden on the University and negatively impact student enrollment and retention numbers. Dr. Chambers explained that the administrative consolidation of three campuses changed the process for scheduling courses and that reduced faculty numbers had led to an increased need for in-person courses, particularly for first- and second-year students. Dr. Chambers testified that students prefer in-person instruction and indicated that a decreased demand for remote instruction had led the University to eliminate two online courses previously taught by Dr. Pack. *Id.* at 9-10 & n.5.

The University lastly presented Guiser's testimony. He confirmed that in-person teaching was an essential function of Dr. Pack's position and that a fully online schedule would impose an undue hardship. Guiser cited in support Article 41 of the CBA, which makes distance education voluntary for faculty and, thereby, implies that in-person instruction is essential. *Id.* at 10-11.

After considering the testimony and post-hearing briefs, the Arbitrator concluded the University violated the CBA by refusing to accommodate Dr. Pack's request for a fully online teaching schedule, which the Arbitrator determined to be reasonable. The Arbitrator first concluded that the University's decision-making process, from which Dr. Pack was excluded, was a "sham" and not interactive at all. The Arbitrator noted that Dr. Pack's involvement was necessary to determine whether her disability continued and whether she could meet her department's needs through a fully-online schedule. Without her involvement, the University considered only the department's needs and did not meaningfully consider whether the disabilities could be accommodated. The Arbitrator similarly concluded that Dr. Pack's appeal from Salsgiver's decision was given short shrift by Guiser, who did not conduct any independent investigation. Rather, Guiser merely reviewed documents and "rubber-

7

stamped" Salsgiver's decision without any critical analysis or independent determination as to whether Dr. Pack's requested accommodation was reasonable. *Id.* at 13-15.

On the merits, the Arbitrator concluded as follows:

I find no reliable support for the contention that face-to-face instruction is an essential function of a faculty member's position. There is no provision in the [CBA], nothing in a job description, and no mention in a course catalog that states that teaching in-person is an essential function. No [University] documents, policies, or other written sources were produced. . . .

[Regarding Guiser's Article 41 argument], I cannot agree. Making online teaching voluntary does not mean or even imply that face-to-face instruction is somehow an essential job function. The plain truth is that a teacher's primary job is to teach, by whatever means that can be accomplished, whether in-person or via virtual instruction. Moreover, the [University] was unable to establish face-to-face teaching as an essential function by its own actions. For many years, [Dr. Pack] has been successfully teaching courses on-line. And significantly, for the first two (2) years after becoming disabled, [Dr. Pack] was assigned to a full online courseload. Not a word was mentioned in those years about in-person teaching being regarded as an essential function.

The contention that providing [Dr. Pack] with her requested accommodation would result in an undue hardship similarly fails. There was no credible evidence that the accommodation would result in a significant financial or operational cost to the University. Even if [the University] had been able to convincingly establish that a student retention problem could occur, that possible outcome cannot by itself pose a result so burdensome that an accommodation to one faculty member could legitimately be denied. The fact is that . . . many other English courses continued to be scheduled online. I am, therefore, convinced that [Dr. Pack] could readily have been accommodated without an undue hardship to the Employer.

8

In sum, the record reveals that online teaching was available and [Dr. Pack] could have been assigned to a full-time online schedule as an accommodation to her disability. The claim that face-to-face instruction was an essential job function was unproven, and a full-time online assignment, while perhaps inconvenient for [University] administration or for the English department chair, would not have posed an undue hardship. The [University's] refusal to grant [Dr. Pack's] requested accommodation was, therefore, violative of the [CBA].

. . . .

### AWARD

. . . .

The [University] is directed to accommodate [Dr. Pack's] disability and to immediately return her to 100% online teaching.

*Id.* at 15-17.

The University now appeals to this Court.

## II.  ISSUES

The University argues that (1) the Arbitration Award fails to draw its essence from the CBA because (a) the Arbitrator impermissibly infringed on the University's managerial rights to determine its standards of service and direct its workforce, and (b) the Arbitrator misinterpreted and failed to properly apply the ADA; and (2) the Arbitration Award violates well-established and defined public policy by usurping the University's managerial authority.

## III.  DISCUSSION

### A.  Standard of Review

Our review of grievance arbitration awards is circumspect and highly deferential. We apply the two-prong "essence" test analysis to determine whether (1) the issue is encompassed by the collective bargaining agreement; and (2) the arbitrator's interpretation of the collective bargaining agreement can rationally be

9

derived from its terms. If both prongs of the test are met, we must affirm the arbitration award unless it violates a dominant public policy. *Millcreek Township School District v. Millcreek Township Educational Support Personnel Association*, 210 A.3d 993, 996 (Pa. 2019). Stated differently, and subject to the narrow public policy exception, we may not vacate an arbitration award unless it "indisputably and genuinely is without foundation in, or fails to logically flow from, the [collective bargaining agreement]." *Id.* (citation and quotations omitted). This Court's disagreement with the arbitrator's interpretation of the collective bargaining agreement will not serve as a ground to vacate the award. *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 245 A.3d 333, 338 (Pa. Cmwlth. 2020). Moreover, "the arbitrator's findings of fact are binding on the courts, and the reviewing court may not undertake any independent factual analysis." *Pennsylvania State System of Higher Education, Lock Haven University v. Association of Pennsylvania State College and University Faculties*, 193 A.3d 486, 495 (Pa. Cmwlth. 2018) (citation omitted); *see also id.* ("a court may not review the merits or reasonableness of the arbitrator's award under the guise of the essence test") (citation omitted).

Our review of the remedies afforded by an arbitrator also are governed by the essence test. "[A]n arbitrator possesses the authority to fashion remedies necessary to further the intended essence of a [collective bargaining agreement]." *Rose Tree Media Secretaries & Educational Support Personnel Association-ESPA, PSEA-NEA v. Rose Tree Medial School District*, 136 A.3d 1069, 1080 (Pa. Cmwlth. 2016) (citation omitted). An arbitrator may fashion a remedy that is not word-for-word prescribed by the collective bargaining agreement as long as the remedy furthers its essence. *Lock Haven University*, 193 A.3d at 495; *see also id.* ("An arbitrator must be given latitude and flexibility in fashioning a proper remedy and should not be limited in his or her problem solving to the language in the [collective bargaining a]greement.") (citation,

internal quotations, and some editing removed). The arbitrator may not, however, change the language of the collective bargaining agreement or add new or additional terms to it. *Id.* at 496. Where an award manifests an infidelity to the terms of the collective bargaining agreement, we must refuse to enforce it. *Id.*

The party challenging an arbitration award bears the burden of establishing that it does not draw its essence from the collective bargaining agreement. *County of Allegheny*, 245 A.3d at 338-39. Given our limited review, an arbitrator's award must be final and binding on the parties in the vast majority of cases. *Millcreek Township School District*, 210 A.3d at 1002.

## B. Analysis

## 1. The Essence Test

The parties do not dispute that the first prong of the essence test is satisfied. (University Br. at 21; APSCUF Br. at 21 n.9.) We therefore consider it established that the issue of whether and to what extent the University must accommodate Dr. Pack for her disabilities is encompassed by the terms of the CBA.

The parties' dispute centers on the second prong, namely, whether the Arbitration Award, including the Arbitrator's interpretation of the CBA's terms and the specific relief granted, logically derive from the CBA. As to this prong, our Supreme Court has explained:

> Under the second prong, we ask whether the award itself can rationally be derived from the [collective bargaining agreement]. Here, again, we emphasize that the parties to a [collective bargaining agreement] have agreed to allow the arbitrator to give meaning to their agreement and fashion appropriate remedies for unforeseeable contingencies. The words of the [collective bargaining agreement] are not the exclusive source of rights and duties. The arbitrator is authorized to make findings of fact to inform his interpretation of the [collective bargaining agreement].

11

> Accordingly, even though an arbitrator is not permitted to ignore the [collective bargaining agreement's] plain language in fashioning an award, the arbitrator's understanding of the plain language must prevail. A reviewing court should not reject an award on the ground that the arbitrator misread the contract. The law is clear that an arbitrator's award must draw its essence from the [collective bargaining agreement]. It need not [ ] reflect the narrowest possible reading of the [collective bargaining agreement's] plain language. Even if a court's interpretation of the [collective bargaining agreement] is entirely different than the arbitrator's, the award must be upheld so long as it rationally derives from the [collective bargaining agreement].

*Millcreek Township School District*, 210 A.3d at 1006 (internal quotation marks and citations omitted).

The University argues that the Arbitration Award fails to draw its essence from the CBA in two ways: (1) the relief afforded by the Arbitrator is not authorized by the CBA and violates the University's managerial authority; and (2) the Arbitrator failed to properly apply the requirements of the ADA or afford ADA-appropriate relief. We disagree in both respects.

a.     Violation of the CBA's Terms and University Authority

The University first contends that the Arbitration Award, in directing that Dr. Pack be returned to a fully online teaching schedule, encroaches upon the University's inherent managerial authority and is not authorized by the CBA's terms. The University insists that the Arbitrator inserted additional terms into the CBA and interpreted it in a fashion that violates the University's rights under Article 10 of the

12

CBA[5] and under Section 702 of the Public Employe Relations Act (PERA).[6]  More specifically, the University argues that the Award impermissibly precludes Dr. Pack from teaching in person for the remainder of her employment, removes from her responsibilities that she was hired to undertake, and requires the University to re-write her job description, all of which are beyond the CBA's terms.  According to the University, "the parties in this case never contemplated or even negotiated granting the

---

[5] Article 10 of the CBA, titled "Rights of the State System/Universities," provides as follows:

> A.    The [University], at [its] sound discretion, possess[es] the right, in accordance with applicable laws, to manage all operations including the direction of FACULTY and the right to plan, direct and control the operation of all facilities and property of the [University], except as modified by this [CBA].
>
> B.    As provided by [Section 702 of PERA], matters of inherent managerial policy are reserved exclusively to the [University].  These "include, but shall not be limited to such areas of discretion or policy as the functions and programs of [the University], standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel."
>
> C.    The listing of specific rights in this Article is not intended to be or should not be considered restrictive or a waiver of any of the rights of management not listed and not specifically surrendered herein, whether or not such rights have been exercised by the [University] in the past.

(R.R. at 317a.)

[6] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. § 1101.702.  Section 702 provides as follows:

> Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, **standards of services**, its overall budget, utilization of technology, the organizational structure and **selection and direction of personnel**. **Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.**

*Id.* (emphasis provided).

[A]rbitrator the ability to direct [University] employee work assignments." (University Br. at 27-28.)

Both parties agree that Article 3 of the CBA controls here and incorporates the ADA's accommodation requirements. We therefore begin with a brief summary of them. Section 12132 of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Pertinent here, discrimination occurs when an employer does "not mak[e] reasonable accommodations [of] the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer.]" 42 U.S.C. § 12112(b)(5)(A).

Generally, to establish a *prima facie* case of disability discrimination, a claimant must prove that: (1) she is disabled; (2) she is a "qualified individual," *i.e.*, she is able to perform the essential functions[7] of a job with or without reasonable accommodations; and (3) she suffered an adverse employment action that was discriminatory. *Canteen Corporation v. Pennsylvania Human Relations Commission,* 814 A.2d 805, 811 (Pa. Cmwlth. 2003); *Taylor v. Phoenixville School District*, 184 F.3d 296, 306, 311 (3d Cir. 1999). In the failure-to-accommodate context, the elements are slightly modified; there, the claimant must establish that (1) she is disabled; (2) her employer had notice of her disability; (3) she can perform the essential functions of her

---

[7] The "essential functions" of a job refer to those job duties that are fundamental to the position and not marginal. *See* 29 C.F.R. § 1630.2(n). The question of whether a particular function is "essential" to a job typically requires an inquiry into whether an employer actually requires employees in a given position to perform the function and, if so, whether removing the function fundamentally alters the job. *See* 29 C.F.R. pt. 1630, App. § 1630.2(n).

14

job with a reasonable accommodation; and (4) her employer failed to provide a reasonable accommodation. *Arana v. Temple University Health System*, 776 F. App'x 66, 71 (3d Cir. 2019); *Campo v. Mid-Atlantic Packaging Specialties, LLC*, 564 F. Supp. 3d 362, 388 (E.D. Pa. 2021); *Hofacker v. Wells Fargo Bank National Association*, 179 F. Supp. 3d 463, 468-469 (E.D. Pa. 2016).

Although employers must afford *reasonable* accommodations to disabled employees, they are not duty-bound to provide *requested* or *ideal* accommodations. *Yovtcheva v. City of Philadelphia Water Department*, 518 F. App'x 116, 122 (3d Cir. 2013); *Hofacker*, 179 F. Supp. 3d at 469. An employer also is not required to provide an accommodation where it would cause undue hardship, and an employer bears the burden of establishing such a hardship. *Taylor*, 184 F.3d at 306 (citing 29 C.F.R. § 1630.2(o)(3)). Whether a particular accommodation is reasonable is usually gleaned through the parties' good-faith engagement in an interactive process in which they discuss various options in light of their respective interests. *Mengine v. Runyan*, 114 F.3d 416, 419-20 (3d Cir. 1997); 29 C.F.R. § 1630.2(o)(3).

Lastly, violations of the ADA, including the failure to provide a reasonable accommodation, may be remedied by way of equitable and affirmative action relief. *Montanez v. Price*, 154 F.4th 127, 146 (3d Cir. 2025) (citing Section 12133 of the ADA, 42 U.S.C. § 12133, and Section 794a of the Rehabilitation Act, 29 U.S.C. § 794a) (authorizing equitable and affirmative action remedies).

Upon review of the Arbitration Award, we find it to be plainly derived from Article 3 of the CBA, which incorporates these ADA standards. There is no dispute that Dr. Pack is disabled, that the University was aware of her disability, and that she requested an accommodation. Thus, the issues before the Arbitrator were (1) whether Dr. Pack can perform the essential functions of her position with a reasonable accommodation; (2) the nature of a reasonable accommodation in this instance, gleaned

15

chiefly through the interactive process, and (3) whether any particular accommodation would cause the University an undue hardship.

The Arbitrator analyzed and answered those questions. More specifically, the Arbitrator rejected the University's claim that teaching in-person was an essential function of Dr. Pack's position because (1) the University presented no documentary evidence substantiating that fact; (2) the CBA itself encourages and incentivizes distance education, *see* Article 41(G)(1)-(2) of the CBA; R.R. at 423a; and (3) the voluntary nature of participation in distance education does not necessarily mean that some in-person instruction is mandatory for all faculty. The Arbitrator further concluded that the University failed to engage adequately in the interactive process because Dr. Pack was excluded from Salsgiver's meetings with University administration. Lastly, the Arbitrator rejected the University's claim that a fully online schedule would cause the University an undue hardship, concluding that any burden caused by the accommodation would not, as the University attempted to argue, result in decreased student enrollment or retention or necessitate an overly-burdensome need to hire adjunct faculty to teach additional in-person courses. (Arbitration Award, at 12-16.) The Arbitrator thus concluded that Dr. Pack's requested accommodation was reasonable and directed the University to return her to the previously-authorized, fully online teaching schedule. The Arbitration Award in all of these respects draws its essence from the CBA and from the ADA standards it incorporates, and the Arbitrator did not add any terms to the CBA or usurp the University's managerial prerogatives.

Our decision in *Lock Haven University* is instructive here. There, the State System appealed to this Court from an arbitration award that directed the reinstatement of a professor who was discharged due to Lock Haven University's discovery in 2016 of sex-related offenses the professor committed in 1990. The professor filed a grievance, and the arbitrator concluded after hearing that Lock Haven did not have just

16

cause to terminate. The arbitrator awarded reinstatement and precluded Lock Haven from assigning the grievant to teach 100-level classes or programs that admitted "dual-enrolled" high school students. *Id.* at 489.

In this Court, the State System argued, as the University does here, that the arbitrator's remedy precluding Lock Haven from assigning the grievant to teach 100-level courses with dual-enrolled students encroached on its inherent managerial rights under the CBA to direct the teaching assignments of faculty. *Id.* at 495. More specifically, the State System argued that, pursuant to Article 10 of the CBA and Section 702 of PERA, it has the managerial right to manage operations and select and direct faculty, which are not bargainable matters. *Id.* The State System complained that the award removed from the grievant a significant amount of work for which he was hired and changed his job description. *Id.*

We disagreed, noting that the arbitrator specifically concluded that being in contact with dual-enrolled students was not essential to the grievant's job. We further noted that, although the selection and direction of personnel was a matter of inherent managerial policy reserved to Lock Haven by the CBA, the arbitrator's award still drew its essence from the CBA for multiple reasons. *Id.* at 496. First, the arbitrator's award was crafted to both comply with the requirements of the Child Protective Services Law[8] and to allay Lock Haven's concerns about the grievant's contact with minors. *Id.* at 496-97. The arbitrator further found that the grievant's revised courseload would not be a burden on Lock Haven because there were other upper-level classes he was qualified to teach and that would satisfy his workload requirement. *Id.* at 497. Lastly, we noted that the State System had not established in the record that teaching 100-level classes was required of the grievant, of other professors in the grievant's department, or of any faculty at Lock Haven. For that

---

[8] 23 Pa.C.S. §§ 6301-6388.

reason, the award did not preclude the grievant from performing his principal duties as a faculty member. *Id.*

Similarly here, we reject the University's argument that the Arbitration Award adds any terms to the CBA or unnecessarily usurps, infringes upon, or ignores managerial prerogatives recognized in either Article 10 of the CBA or Section 702 of PERA. The Arbitrator concluded that the University violated Article 3 of the CBA by denying Dr. Pack the ability to *continue* her fully-online teaching schedule as a reasonable accommodation of her disability. The Arbitrator then directed that the University *return* Dr. Pack to that mode of teaching. The Arbitrator did not fashion a new accommodation but rather restored the status quo *ante* by returning Dr. Pack to what the University, based on the same disability with the same limitations, already had authorized for the prior two academic years. The Award in this respect clearly draws its essence from Article 3.

Moreover, the Arbitrator did not, as the University broadly suggests, direct the hiring, firing, or re-assignment of any faculty, direct the creation, modification, elimination, or transfer of any courses, modify the mode of instruction of any particular courses, or direct that the University relax or alter its academic standards for Dr. Pack, other faculty members, or any students. Nor did the Arbitrator direct anything into perpetuity. Instead, the Award directs a particular accommodation based on the circumstances of a particular academic year, which accommodation the Arbitrator found would not impose an undue burden on the University. The Award therefore does not ignore, run afoul of, add anything to, or delete anything from Article 10 of the CBA. It simply reads Article 10 as contractually limited by Article 3. And, to the extent that the University would need to make changes to its curriculum or course schedules to provide the directed accommodation, those changes would only be a practical consequence of the University's having executed Article 3.

In sum, then, the University contractually agreed in Article 3 to accommodate faculty disabilities in accordance with the ADA. The Arbitrator applied the ADA's requirements, determined that the University did not lawfully accommodate in this instance, and fashioned an award granting a particular accommodation that does not usurp the University's managerial rights under Article 10. The Award therefore draws its essence from the CBA, and the University's arguments to the contrary fail.

b. Violation of the ADA

The University next argues that the Arbitration Award fails to draw its essence from the CBA because the Arbitrator did not appropriately apply the ADA's requirements or issue ADA-appropriate relief. We disagree.[9]

The University contends that, although the "Arbitrator may have thought that he was properly interpreting and applying the ADA," he got it wrong. The University argues that the Arbitrator did not appropriately interpret the evidence, made findings not supported by the testimony, did not understand the ADA's requirements, and did not fashion appropriate relief. *Id.* at 30-38. We have already noted that, in our review of grievance arbitration awards under PERA, we do not review whether the Arbitrator's findings are correct, whether the Arbitrator properly understood the evidence, or whether the Arbitrator's interpretation of the CBA's terms was correct. That continues to be the case where, as here, the parties' CBA incorporates by reference

---

[9] The University initially argued before the Arbitrator that whether the University violated the ADA was *not* an arbitrable issue. *See* R.R. at 24a-39a; Arbitrator's Award at 2-3. The University then changed its position and re-stated the issue to include whether it violated the CBA's terms by denying Dr. Pack a reasonable accommodation under the ADA. *See* Arbitrator's Award at 3. Now, in its briefing to this Court, the University contends outright that the Arbitrator comprehensively "failed to mention or analyze any of the ADA requirements," "clearly failed to analyze any of the evidence offered by the University" as to reasonable accommodation, "did not understand the ADA process, nor what evidence was relevant," and "failed to understand the legal process of how reasonable accommodations are processed and determined." (University Br. at 31, 32, 33.) The University thus concedes, at least for purposes of the essence test, that the Arbitrator was empowered by Article 3 of the CBA to interpret, apply, and afford relief under the ADA.

19

legal standards from a statute or regulation. Simply put, whether the Arbitrator "got it right" in these respects is not before us.

As we already have explained at length, it is plain from the Arbitration Award that the Arbitrator applied the accommodation requirements of Article 3 and, therein, the ADA, determined that the University did not comply, and directed the reinstatement of a particular accommodation that the Arbitrator determined to be reasonable. Our limited review under the essence test proceeds no further. As argued by APSCUF, "this [C]ourt may not substitute its judgment for that of the Arbitrator [where,] as here, the findings, analysis, conclusions, and the remedy are all allegiant to the CBA." (APSCUF Br. at 34.)

## 2. Public Policy

Lastly, the University argues in the alternative that, even if the Arbitration Award draws its essence from the CBA, it nevertheless contravenes well-established public policy and should be vacated for that reason. The University contends that it has, pursuant to Article 10 of the CBA and Section 702 of PERA, exclusive managerial authority to, among other things, set its standards of service and select and direct its personnel. Notwithstanding Article 3's accommodation requirements, the University insists that it retains the inherent authority to determine how instruction will occur. Accordingly, although an arbitrator may determine that the University failed to accommodate a particular disability, he or she may not, without violating public policy, direct an accommodation that interferes with the University's managerial rights.

APSCUF responds that the CBA's express terms, namely, Article 3, require the University to accommodate disabilities as provided in the ADA. Because injunctive and equitable relief directing specific accommodations is available under the ADA, APSCUF contends that the Arbitrator had the authority to award specific accommodation relief. Although APSCUF acknowledges the University's managerial

20

authority over curriculum and the direction of its workforce, it nevertheless points out that the University contracted for a specific limitation on that authority by agreeing to accommodate disabilities in accordance with the ADA. Thus, according to APSCUF, the Arbitration Award merely enforces Article 3 and directs a reasonable accommodation "as the law requires."

We conclude that the Arbitration Award neither implicates nor violates any well-established public policies and that the University's argument in this respect is only a rehashing of its challenge under the essence test. In determining whether a binding arbitration award violates public policy, our Supreme Court has admonished:

> [N]ot only is the public policy exception exceptionally narrow in its own right, but it is also an exception to the essence test, which is itself a narrow exception to the doctrine that arbitration awards are final and binding. [That] the public policy exception is a narrow exception to a narrow exception must guide a reviewing court's analysis.

*Millcreek Township School District*, 210 A.3d at 1011. In light of that principle, the Supreme Court has established a three-part test for determining whether an arbitration award violates well-established public policy:

> First, a reviewing court must identify precisely what remedy the arbitrator imposed. Next, the court must inquire into whether that remedy implicates a public policy that is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator. We emphasize that the arbitrator's interpretation of the contract controls during this entire analysis, which is only triggered upon the reviewing court's determination that the award satisfies the essence test, and should be upheld absent a clear violation of public policy. The burden is on the party that

21

> opposes the award to demonstrate that it violates public policy.

*Id.* at 1011 (internal citations, quotations, and emphasis omitted).[10]

First, as to the remedy ordered, the Arbitrator concluded that the University *violated the CBA* by denying Dr. Pack the ability to continue her fully-online teaching schedule as a reasonable accommodation of her disability. The Arbitrator then directed the University to *return* Dr. Pack to that schedule. As we already have noted, the Arbitrator did not direct the hiring, firing, or reassignment of any faculty, direct the creation, modification, elimination, or transfer of any courses, modify the mode of instruction of any courses, require the relaxation of any academic standards, or order anything into perpetuity. Properly understood in this narrow sense, the Arbitration Award simply does not implicate any established public policies that "favor" the University's managerial rights.

Moreover, even if the Arbitration Award did implicate such rights, it does not violate them in this instance. Although it is true that both Article 10 of the CBA and Section 702 of PERA recognize the University's inherent and non-bargainable rights to, among other things, direct faculty and set service standards, the University has contractually agreed to limit those rights in accordance with the ADA's accommodation requirements. Thus, to the extent that the Arbitration Award's *effect* might require the University to rearrange schedules, modify class structures, or reassign courses, those changes would only be, in this instance, the practical consequences of the University's execution of Article 3 of the CBA. The University's public policy argument accordingly is without merit.

---

[10] Because this case does not involve a discipline grievance, we do not apply the test set forth by this Court in *City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408 (Pa. Cmwlth. 2011). *See Lehigh and Northampton Transportation Authority v. Amalgamated Transit Union, Local 956*, 336 A.3d 263, 272 n.12 (Pa. Cmwlth. 2025).

22

## IV. CONCLUSION

Because we conclude that the Arbitration Award draws its essence from the CBA and does not implicate or violate public policy, we must affirm.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Western University of
Pennsylvania, State System of
Higher Education,
            Petitioner

        v.

Association of Pennsylvania State
College and University Faculty,
            Respondent

:
:
:
:
:
:
:   No. 1424 C.D. 2024
:
:
:
:

## ***ORDER***

AND NOW, this 9th day of January, 2026, the September 24, 2024 Arbitrator's Award and Opinion is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge